IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

ANTHONY D. JOHNSON,

            Plaintiff,

      v.

DAVITA, INC., and TOTAL RENAL
CARE, INC.,

            Defendants.

CIVIL ACTION FILE

NO. 1:12-CV-02720-RWS-GGB

## FINAL REPORT AND RECOMMENDATION

This is an employment discrimination case.  Plaintiff Anthony Johnson is bringing claims of race discrimination, sex discrimination, and retaliation against his current employers, DaVita Inc. and Total Renal Care, Inc.  The case is now before the Court on Defendants' motion for summary judgment (Doc. 46).  After review of the evidence and the parties' arguments, I **RECOMMEND** that the motion for summary judgment be **GRANTED IN PART** and **DENIED IN PART**.  No reasonable jury could find that Defendants discriminated against Johnson based on his race or his sex, but a jury could return a verdict in Johnson's favor on his retaliation claims.

## I.      Standard for Summary Judgment

A court should grant summary judgment when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.

Fed.R.Civ.P. 56(a).  The movant carries its burden by showing the court that there is "an absence of evidence to support the nonmoving party's case."  Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986).  "Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment."  Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).

The nonmovant is then required "to go beyond the pleadings" and to present competent evidence in the form of affidavits, answers to interrogatories, depositions, admissions and the like, designating "specific facts showing that there is a genuine issue for trial."  Celotex Corp., 477 U.S. at 324; 106 S.Ct. at 2553 (quotation omitted); see Fed.R.Civ.P. 56(c).  "[M]ere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion."  Ellis v. England, 432 F.3d 1321, 1326 (11th Cir. 2005).  Resolving all doubts in favor of the nonmoving party, the court must determine "whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).

## II.    Summary Judgment Evidence

DaVita Renal Healthcare, Inc. and Total Renal Care are divisions of DaVita Healthcare Partners, Inc., a company that provides kidney and dialysis services across the United States.  (Doc. 46-1, Defendants' Statement of Undisputed Material Facts ("DSMF") ¶¶ 2-3).  DaVita's clinics and dialysis centers are grouped into geographical divisions, each headed by a Vice President.  (Id. ¶ 5).  The divisions are further subdivided into regions, which are overseen by Regional Operating Directors, or "RODs."  (Id.).  Each ROD receives administrative support from a Regional Operating Coordinator, or "ROC."  (Id. ¶ 8).  ROCs are called upon to perform secretarial tasks, coordinate meetings and conference calls, gather data and prepare information needed by their ROD, and communicate with DaVita's facilities and customers in the region. (Id. ¶ 9).

Anthony Johnson, a white male, has been working for DaVita or its predecessor companies for many years.  (Doc. 60, Plaintiff's Statement of Undisputed Material Facts ("PSMF") ¶ 4).  He rose to become a ROC for Region 3, headed by ROD Lynn Fernandez, and Region 7, headed by Group Facilities Director Danielle Hill.  (PSMF ¶¶ 12-13).  It is common for a ROC to support two different regions.  (Id. ¶ 11).  Both Fernandez and Hill viewed Johnson as a competent employee.  (Doc. 48, Hill Dep.

at 11-14; Doc. 52, Fernandez Dep. at 36-39, 45).  In addition to his regular duties, Johnson also volunteered with DaVita's employee training program, called "Star Makers."  (Id. ¶ 12; see DSMF ¶ 53).

In 2010, DaVita created a new Region 8 and hired Lakila Richardson, a black female, to run the region.  (DSMF ¶¶ 26-29).  Johnson was assigned to serve as ROC for Region 8 in addition to his existing responsibilities for Regions 3 and 7 and the "Star Makers" program.  (PSMF ¶¶ 6, 14).  Soon after Johnson came on board, Richardson met with him to discuss her performance expectations.  (DSMF ¶ 36).  She stressed the need for confidentiality, timeliness, thoroughness, and creativity.  (Id. ¶ 38).  The two also discussed planning, problem solving, and the importance of communication.  (Id. ¶ 40).  Richardson told Johnson that she was concerned about his ability to effectively split time between Region 8 and his other job duties.  (Id.).  Johnson had privately expressed similar reservations to Fernandez, the ROD of Region 3.  (See id. ¶ 32).

Johnson had not worked for Region 8 for long before Richardson started to notice problems with his performance.  One of Johnson's first assignments was to gather census details for a report that Richardson was going to write for the Divisional Vice President, Robert Perraud.  (DSMF ¶¶ 6, 44).  Richardson wanted the information by

August 2, but Johnson did not respond until August 24.  (Id. ¶¶ 44-45).  Johnson admitted that he "dropped the ball" with respect to that project.  (Id. ¶ 45).

In Richardson's view, things only went downhill from there.  A report on vaccination rates was incomplete because Johnson did not know where to find all of the information that Richardson wanted.  (Doc. 47, Johnson Dep. at 161-62 and Exh. 10; Doc. 50, Richardson Dep. at 296-97).  On another occasion, Richardson asked for basic cost information and electronic copies of medical director agreements and facility leases.  (Doc. 50, Richardson Dep. at 306 and Def. Exh. 7).  She did not receive a response as soon as she wanted and had to follow up with Johnson the next day.  (Id.).  When Johnson did send the information, Richardson discovered that he had left out certain details that she needed.  (Id.).

Johnson also failed to meet Richardson's deadlines for submitting the "homeroom call notes," which were the minutes of a weekly telephone conference that Richardson had with all of the Facilities Administrators in her region.  (Doc. 50, Richardson Dep. at 317).  The notes described the deadlines and immediate task assignments that Richardson had imposed during the conference call.  (Id. at 318; see, e.g., Def. Exh. 13).  Richardson wanted the administrators to be able to use the notes as a reference, and, due to the immediacy of some of the deadlines, she wanted Johnson

to type up the notes no later than noon on the morning of the meeting. (Doc. 50, Richardson Dep. at 318). In practice, Johnson sometimes did not submit the notes until later in the afternoon, and on one occasion, he did not submit the minutes until the following week. (Doc. 47, Johnson Dep. at 247; Doc. 50, Richardson Dep. at 320, 326).

Johnson also had to prepare monthly progress reports comparing clinic performance in Region 8 with clinics in other regions. (DSMF ¶ 58). On one occasion, Richardson emailed Johnson to remind him that she needed the September report for a meeting with Vice President Perraud the following morning. (Id. ¶ 59). Johnson was aware that Richardson had wanted the report earlier, but he advised her that it was not yet finished. (Id. ¶ 60).

Johnson recognized that he was not meeting all of Richardson's deadlines and expectations, but he believed that Richardson "wanted the impossible." (Doc. 47, Johnson Dep. at 247). In his view, he simply could not complete the homeroom call notes by the noon deadline because he had to fulfill other responsibilities for the "Star Makers" training program. (Id. at 247-48, 285, 290-91). Other reports were delayed or incomplete because the information that Richardson wanted was not available. (Id. at 161-63, 183-84, 196, 204, 206).

Johnson also came to believe that the reason why Richardson was imposing unreasonable demands on him was because he was a white male.  He observed that Richardson was friendly and approachable when meeting black females, but that she displayed a cold and distant manner towards him.  (Doc. 47, Johnson Dep. at 139, 157, 175-76).  Other employees also told Johnson that they thought that Richardson was racist.[1]  (Id. at 176-78, 182-83, 233, 581-82).  His other supervisors, Fernandez and Hill, agreed that Richardson was harder on Johnson because he was white.[2]  (Id. at 176-78, 182-83, 405-06, 581-82).

Johnson has pointed to other facts which, in his view, support a finding that Richardson discriminated based on an employee's race and sex.  Of the four hires that Richardson made, all four were women, and three were black.  (See Doc. 50, Richardson Dep. at 22-23, 28-30, 33).  Johnson also argues that Richardson's personal history gave her a reason to discriminate.  Richardson testified that she had been

_____

[1]Defendants argue that this evidence, and other portions of Johnson's deposition testimony, are hearsay and may not be considered in ruling on his summary judgment motion.  In this section, I will simply outline the evidence presented by the parties; I will address issues related to admissibility in the Discussion section, below.

[2]In their respective depositions, Fernandez and Hill could not recall making any such statements to Johnson, but, for purposes of this summary judgment motion, I view the facts in the light most favorable to Johnson.  (See Doc. 48, Hill Dep. at 14; Doc. 52, Fernandez Dep. at 114).

7

discriminated against by white supervisors in the past and had once been racially profiled by a white police officer.  (Id. at 40-43, 45-47).

In short, Richardson believed that Johnson's performance fell below her standards, while Johnson believed that Richardson was imposing unreasonable demands on him because he was a white male.  The situation was rapidly building towards a confrontation.  Matters came to a head over an all-day meeting that Richardson had placed on her calendar for October 26.  (Doc. 47, Johnson Dep. at 239).  Johnson had access to the calendar, but he did not learn of the meeting.  (Id. at 238-41).  Therefore, he did not set up the meeting area or order food in advance.  (Doc. 50, Richardson Dep. at 308-09).

Johnson eventually did learn of the meeting on the morning of October 26, and set about ordering food.  (Doc. 47, Johnson Dep. at 238).  The breakfast was not delivered until late morning, which, in Richardson's opinion, "was a major disruption to the meeting."  (Doc. 50, Richardson Dep. at 309).  Later that day, Richardson criticized Johnson for his delay in ordering breakfast.  (Doc. 47, Johnson Dep. at 238-41).  For Johnson, that was the last straw.  He told Richardson that she had been trying to get rid of him from the beginning and that she did not like him because of his race and his sex.  (Id. at 243-44).  He announced that he would file a complaint with

People Services (the name of DaVita's Human Resources department). (Id. at 242-43, 572). Richardson replied that she might have to place Johnson on a Performance Improvement Plan ("PIP"). (Id. at 242-44, 500-01, 572).

Richardson and Johnson both followed through on their promises. On October 27, Richardson informed Kamesia Turner, the People Services representative for her division, that she was planning to place Johnson on a 60-day PIP. (DSMF ¶ 71). The next day, Johnson sent a formal complaint to Turner in which he accused Richardson of race discrimination and sex discrimination. (Doc. 49, Turner Dep. at 27; Doc. 50, Richardson Dep. at 114-16 and Plf. Exh. 4). Johnson emailed a copy of his complaint to the Divisional Vice President, Robert Perraud, who forwarded it to Dena Levine, Turner's supervisor. (Doc. 53, Perraud Dep. at 61-63 and Exh. 4). Perraud added a comment: "I'm not buying most of this and have seen no evidence of discrimination from her." (Id.). Turner was assigned to investigate the complaint. (PSMF ¶ 37).

Later that day, Perraud met personally with Richardson to address Johnson's complaint. (PSMF ¶ 38). During that conversation, Richardson "may" have told Perraud that she did not want Johnson to support her region any longer. (Doc. 53, Perraud Dep. at 62). Perraud responded that they needed to go through "all the steps"

and document "what was going on." (PSMF ¶ 40). Richardson "wasn't pleased with" Johnson's complaint and "may" have said that she no longer trusted Johnson. (Doc. 53, Perraud Dep. at 60).

Four days later, Richardson and Turner met with Johnson and formally notified him that he was being placed on a PIP. (DSMF ¶ 73; PSMF ¶¶ 44, 47). The plan called for Johnson to improve his communication, his attention to detail, and his compliance with Richardson's instructions. (See Doc. 47, Johnson Dep., Def. Exh. 17 at 1-3). Johnson was warned that he could face additional discipline, up to and including termination, if he failed to demonstrate sustained improvement. (Id. at 2).

During the meeting, Johnson repeated his complaint that he had been subjected to discrimination and retaliation. (Doc. 47, Johnson Dep. at 573). Richardson denied those accusations, and Turner then informed Johnson that she had investigated his complaint and found it to be unsubstantiated. (Id.; PSMF ¶ 51).[3] A couple of days after the meeting, Johnson filed a bullet-point response to the PIP. (Doc. 47, Johnson Dep., Exh. 17 at 4-5). He set down his version of events, asserting that Richardson failed to communicate with him and imposed unreasonable demands. (Id.).

---

[3]It is not clear from the record what Turner did to investigate the complaint. (See Doc. 51, Levine Dep. at 66-68; Doc. 49, Turner Dep. at 18, 29-30). She apparently did not speak with Johnson. (See Doc. 47, Johnson Dep. at 472-73).

As the weeks passed, Richardson continued to have issues with Johnson's performance. On November 4, Richardson asked Johnson to arrange a meeting between her and two doctors and to provide her with a date by the following Wednesday. (Doc. 47, Johnson Dep. at 308 and Def. Exh. 21). Johnson failed to schedule the meeting by the deadline and failed to update Richardson until she asked about the status of the meeting. (Id. at 308-09 and Def. Exh. 21). On November 9, Johnson did not send out the homeroom call notes until 11:14 pm, well after the noon deadline. (DSMF ¶ 88). The following week, he sent Richardson a spreadsheet that included incomplete information. (Doc. 50, Richardson Dep. at 321-22 and Def. Exh. 15).

On November 17, Johnson sat down with Richardson and Turner for a follow-up meeting regarding his PIP. (DSMF ¶ 91). Richardson stated that Johnson still had to improve his timeliness, his attention to detail, and his communication. (Id.). After the meeting concluded, he prepared an "Addendum" in which he argued that the recent problems were not his fault, but rather, were caused by unreasonable expectations on the part of Richardson. (Doc. 50, Richardson Dep., Plf. Exh. 8). Johnson submitted the addendum to Turner, who suggested that Richardson should also receive a copy. (Id. at 206-07).

11

After Richardson reviewed the Addendum, she told Johnson that she "appreciated hearing your feedback," but that he still had to do a better job of complying with her directives and deadlines. (Id., Plf. Exh. 9 at 2). She also mentioned that Johnson needed to continue to provide her with status updates. (Id.). The next day, Johnson objected that Richardson's deadlines were too strict and that she was "setting [him] up for failure." (Id.). He quoted from a company policy stating that supervisors must set reasonable goals for employees and must make their instructions clear. (See id.).

Richardson forwarded Johnson's response to Perraud and Levine, telling them that she found the email to be unduly combative and insubordinate. (Doc. 50, Richardson Dep., Exh. 9 at 1). She announced that she would remove Johnson from her region so that she could hire a new ROC. (Id.). She recommended that he be reduced to part-time status, as opposed to being transferred to another region, because "that would be transferring an issue." (Id.). Richardson made the final decision herself; she did not need anyone's approval to remove Johnson. (Doc. 50, Richardson Dep. at 234; Doc. 53, Perraud Dep. at 93-94, 100; Doc. 51. Levine Dep. at 91-92).

On December 2, 2010, Richardson told Johnson that he would be removed from Region 8, effective December 31, because of his failure to meet her performance

12

expectations.  (DSMF ¶¶ 119-20).  Johnson told Richardson that she was retaliating against him, but Richardson responded that the accusation was just Johnson's opinion. (Doc. 47, Johnson Dep. at 573).  Richardson told Johnson that he "didn't have her back" and that she did not trust him.  (Id. at 349-50).  In her deposition, Richardson explained that one factor that contributed to her lack of trust was Johnson's "dishonesty" in claiming that the PIP was put in place to retaliate against him rather than because of legitimate performance concerns.  (Doc. 50, Richardson Dep. at 337-39).

A few days later, Johnson requested a meeting with Levine, the People Services supervisor.  (Doc. 51, Levine Dep. at 104-05 and Plf. Exh. 13).  The two spoke over the telephone, and Johnson expressed his belief that he was a victim of discrimination and retaliation.  (Doc. 58-1, Johnson Decl. ¶ 10).  Levine responded that the company was "not afraid of lawyers" and that Johnson "should really think about complaining anymore because it would ruin your excellent reputation."  (Id.; Doc. 47, Johnson Dep. at 546-49).

On December 17, Richardson prepared a "Performance Follow-Up" that summarized her views on Johnson's performance.  (Doc. 50, Richardson Dep., Plf. Exh. 11).  She wrote that Johnson had failed to meet her expectations during the PIP

period, and offered a number of specific examples, such as the failure to send out the homeroom call notes on time and the problem with scheduling a doctor meeting.  (Id. at 1-2).  Richardson saw no improvement in Johnson's performance until after the December 2 meeting where he was informed of his "status change."  Since that date, Johnson had met the "minimum expectations" for a ROC, but, in light of the "marked inconsistency" in his performance, Richardson reaffirmed that he would be removed from Region 8 at the end of the month.  (Id. at 2).

At the end of December, Johnson was removed from his position with Region 8.  (PSMF ¶ 99).  He was reduced to part-time status, but continued to support Regions 3 and 7.  (Id. ¶¶ 100-01).  Richardson hired Pamela White, a black female, as the new ROC for Region 8.  (Id. ¶ 102).  Johnson acknowledges that White was an excellent choice to fill the position, but he believes that Richardson did not hold White to the same strict standards that she imposed on him.  (Doc. 47, Johnson Dep. at 191, 577-78, 580-81).  On one occasion, White told Johnson that Richardson did not require her to submit the homeroom call notes by the noon deadline that Richardson had given to Johnson.  (Id. at 577-78).

Johnson continued to work for DaVita on a part-time basis for the next several years.  (Doc. 58-1, Johnson Decl. ¶ 11).  In 2013, he was named a Vascular Access

14

Coordinator and finally regained his full-time status.  (PSMF ¶¶ 2, 108).  Meanwhile,

Johnson filed a complaint of discrimination with the Equal Employment Opportunity

Commission, which ultimately led to this lawsuit.  (Doc. 47, Johnson Dep., Def.

Exh. 41).

## III.   Discussion

### A.   Defendants are entitled to summary judgment on Johnson's discrimination claims.

Johnson is raising claims of race discrimination and sex discrimination under

Title VII, as well as a claim of race discrimination under 42 U.S.C. § 1981.  (See

Doc. 1, Complaint).  All of these claims are subject to the same evidentiary framework

and burdens of proof.  Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir.

1998).  To defeat the motion for summary judgment, Johnson must point to either direct

or circumstantial evidence that could lead a reasonable jury to find that he was

subjected to discrimination.  Rioux v. City of Atlanta, 520 F.3d 1269, 1274 (11th Cir.

2008).

Here, Johnson is relying on circumstantial evidence to prove his claims.  He first

argues that he can prevail under the traditional burden-shifting approach of McDonnell

Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Johnson

also asserts that the evidence here creates a "convincing mosaic" of discrimination,

similar to the claim that survived summary judgment in <u>Smith v. Lockheed-Martin Corp.</u>, 644 F.3d 1321 (11th Cir. 2011).  I will address both of these evidentiary frameworks in turn.

> **1.    Johnson has established a prima facie case under <u>McDonnell Douglas</u>.**

In <u>McDonnell Douglas</u>, the Supreme Court set up a three-step framework for proving employment discrimination claims using circumstantial evidence.  The plaintiff first has to present a prima facie case of discrimination.  <u>Wilson v. B/E Aerospace, Inc.</u>, 376 F.3d 1079, 1087 (11th Cir. 2004).  The prima facie case creates a presumption that the plaintiff was subjected to discrimination.  <u>Id.</u>  The burden of production then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the challenged employment action.  <u>Id.</u>  If the defendant is able to offer such a reason, the presumption of discrimination is rebutted, and the burden of production shifts back to the plaintiff to show that the defendant's justification is just a pretext for discrimination.  <u>Id.</u>

Here, Johnson can get past the first stage of <u>McDonnell Douglas</u>: he can establish a prima facie case of both race discrimination and sex discrimination.  One way to establish a prima facie case is to show that: (1) the plaintiff was a member of a protected class; (2) the plaintiff was qualified for the position; (3) there was an adverse employment action; and (4) the employer replaced the plaintiff with someone outside

of the protected class, or treated the plaintiff less favorably than someone outside the protected class.  Maynard v. Bd. of Regents, 342 F.3d 1281, 1289 (11th Cir. 2003).  "The methods of presenting a prima facie case are not fixed; they are flexible and depend to a large degree upon the employment situation."  Wilson, 376 F.3d at 1087.

Johnson has submitted enough evidence to prove all four prongs of his prima facie case.  Defendants do not dispute that Johnson was a member of a protected class and that he was qualified for his position.  The parties also agree that Johnson suffered an adverse employment action when he was removed from his position as ROC of Region 8 and given reduced hours.  The only real question is whether Johnson has shown that he was replaced by someone outside his protected class.  I conclude that Johnson can satisfy that prong because the undisputed evidence shows that he was replaced by Pamela White, a black female.  (See PSMF ¶ 102).

Defendants suggest that White cannot really be viewed as Johnson's "replacement" because Richardson did not intend to hire White at the time when she removed Johnson.  Defendants have not, however, cited to any case law holding that a plaintiff must show that the decision maker intended to replace the plaintiff with someone outside the protected class.  There are good reasons for not imposing such a requirement.  The prima facie case is not meant to be onerous; the plaintiff should be

able to prove it using "objectively verifiable" and "easily obtainable" evidence, without having to introduce evidence of a supervisor's subjective opinions. Cf. Vessels v. Atlanta Indep. Sch. Sys., 408 F.3d 763, 769 (11th Cir. 2005) (emphasis omitted) (rejecting argument that a plaintiff must show that he met a supervisor's subjective expectations in order to satisfy the qualifications prong). If a plaintiff must always come up with evidence of a decision maker's intent, then it would be nearly impossible to get past the first step of McDonnell Douglas. By showing that he was replaced by White, Johnson has successfully established his prima facie case.

> ### 2. Defendants have offered a legitimate, non-discriminatory justification for Johnson's termination.

At the second step of McDonnell Douglas, the defendant must rebut the presumption of discrimination created by the prima facie case by offering a legitimate, non-discriminatory reason for the challenged employment action. Wilson, 376 F.3d at 1087. The defendant "need not persuade the court that it was actually motivated by the proffered reasons." Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981). "It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." Id.

Here, Defendants have met their burden of production by introducing evidence that Richardson was dissatisfied with Johnson's performance. Richardson believed that Johnson was not completing his work in a timely fashion and was submitting reports that were incomplete and inaccurate. (See DSMF ¶¶ 44-45, 58-60; Doc. 47, Johnson Dep. at 161-62, 247 and Def. Exh. 10; Doc. 50, Richardson Dep. at 296-97, 306, 317-18, 320, 326 and Def.Exh. 7). Even after Johnson was placed on a performance improvement plan, Richardson continued to notice problems. (See DSMF ¶ 88; Doc. 47, Johnson Dep. at 308-09 and Def. Exh. 21; Doc. 50, Richardson Dep. at 321-22 and Def. Exh. 15). In Richardson's view, Johnson did not want to take steps to improve his work, but rather, simply tried to cast blame on her own requirements and management style. (See Doc. 50, Richardson Dep., Plf. Exh. 9). Therefore, Richardson decided that she could not work productively with Johnson, and removed him from his position as ROC for Region 8. (See id.). This explanation, if true, could have motivated a reasonable employer to remove Johnson from his position. It serves to rebut the presumption of discrimination.

### 3. No reasonable jury could find Defendants' asserted reasons to be a pretext for race discrimination or sex discrimination.

Since Defendants have proffered a legitimate, non-discriminatory reason for Johnson's removal, the burden of production shifts back to Johnson to show that the

explanation is a mere pretext for sex discrimination and race discrimination.  Wilson, 376 F.3d at 1087.  A plaintiff may establish pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."  Burdine, 450 U.S. at 256, 101 S.Ct. at 1095.  Here, Johnson attempts to use both methods of showing pretext.

First, Johnson argues that Richardson's explanation for her decision is unworthy of belief.  To rebut an employer's explanation, the plaintiff must point to "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence."  Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997) (quotation omitted).  "Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason."  Chapman v. AI Transport, 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc).

Johnson has not successfully rebutted Richardson's explanation for her decision.  He primarily argues that the requirements that Richardson placed on him were unreasonable.  For example, he points out that Richardson wanted him to prepare the

20

homeroom call notes at times when he was supposed to be training employees, and that Richardson criticized his reports for failing to include information that was not available when those reports were drafted.  (Doc. 47, Johnson Dep. at 161-63, 183-84, 196, 204, 206, 247-48, 285, 290-91).  A reasonable jury might conclude from this evidence that Richardson was a demanding or unreasonable supervisor.

Johnson cannot, however, overcome the motion for summary judgment simply by "quarreling with the wisdom" of Richardson's directives.  See Chapman, 229 F.3d at 1030.  Title VII does not prohibit a supervisor from imposing seemingly unreasonable demands, so long as the supervisor treats all employees the same way and does not discriminate based on protected characteristics.  See Alvarez v. Royal Atl. Devs., Inc., 610 F.3d 1253, 1267 (11th Cir. 2010) (employers are "free to set unreasonable or even impossible standards," provided that they are not applied in a discriminatory manner); Nix v. WLCY Radio/Rahall Commc'ns, 738 F.2d 1181, 1187 (11th Cir. 1984) ("[An] employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.").  To successfully show pretext, Johnson has to point to evidence that could lead a jury to conclude that Richardson is not being truthful—that she had no real issues with Johnson's performance, and that she simply said those

things to cover up the fact that she wanted to replace Johnson with a black female employee.

Johnson attempts to meet his burden by arguing that Richardson did not apply the same exacting standards to his black female successor, White. However, the only evidence that he cites are statements made to him by White that Richardson granted her more flexibility with respect to deadlines. (Doc. 47, Johnson Dep. at 580-81). Those out-of-court statements are hearsay and, therefore, cannot be considered by the Court in ruling on the motion for summary judgment. See Jones v. UPS Ground Freight, 683 F.3d 1283, 1293-94 (11th Cir. 2012) (stating that hearsay evidence may not be considered in ruling on a motion for summary judgment, unless it is capable of being reduced to an admissible form at trial).

Johnson also points out that he received largely positive performance reviews from all of his supervisors except for Richardson. The other directors to whom Johnson reported—Fernandez and Hill—were largely satisfied with his work. (Doc. 48, Hill Dep. at 11-14; Doc. 52, Fernandez Dep. at 36-39, 45). The Eleventh Circuit has held, however, that conflicting performance assessments "do not establish a genuine issue on pretext." Rojas v. Florida, 285 F.3d 1339, 1343 (11th Cir. 2002). That is because "[d]ifferent supervisors may impose different standards of behavior." Id. Johnson

cannot use Fernandez's and Hill's assessments to create a material issue of fact as to pretext.

Johnson also attempts to rebut Defendants' explanation by pointing to his December 2010 performance evaluation, in which Richardson wrote that he met the "minimum expectations" for his position. (See Doc. 50, Richardson Dep., Plf. Exh. 11 at 2). This evidence is also unpersuasive. As Defendants point out, a supervisor may certainly insist that an employee do more than meet "minimum expectations." Moreover, the evaluation as a whole actually supports Richardson's non-discriminatory explanation for her decision. It describes numerous specific problems with Johnson's work and suggests that his performance did not meet even the minimum level until after the December 2 meeting when he was informed of his removal from Region 8. (See id. at 1-2).

When all of the above evidence is considered together, it does not undermine Richardson's explanation for her decision. Essentially, Johnson has just shown that Richardson placed arguably unreasonable demands on him and that other supervisors had a different view of his performance. The only evidence that Richardson treated white and black employees differently is a hearsay statement from Pamela White, which

23

the Court may not consider in ruling on the motion for summary judgment.  No reasonable jury could find that Richardson's explanation is unworthy of belief.

As noted above, rebutting the employer's explanation is one of two ways that a plaintiff can establish pretext.  A plaintiff may also establish pretext by persuading the factfinder that discrimination is a more likely explanation for the challenged employment action.  See Burdine, 450 U.S. at 256, 101 S.Ct. at 1095.  Here, Johnson points to several pieces of evidence which, in his view, show that his race and his sex were the real reasons for his termination, but I conclude that this evidence could not persuade a reasonable jury.

Johnson first states that Richardson was friendlier and more approachable towards African-American females than she was towards white males like him.  (See Doc. 58 at 22; see also Doc. 47, Johnson Dep. 175-76).  Even if that is true, however, Richardson's socialization habits do not necessarily prove that she discriminated against white males with respect to any term or condition of employment.  Cf. Douglas v. J.C. Penney Co., Inc., 474 F.3d 10, 15 (1st Cir. 2007) (female supervisor's habit of eating lunch with female employees rather than male plaintiff was insufficient to prove gender discrimination).  The probative value of this evidence is rather low.

Johnson also points out that all four of Richardson's new hires were women, and that three of the four were African-American. Johnson has not, however, provided any information on the race and sex of the other applicants, nor has he attempted to compare the candidates' qualifications. Without that sort of analytical foundation, Johnson's statistical evidence is "virtually meaningless." See Wilson, 376 F.3d at 1088-89 (female plaintiff's evidence that very few women were hired for Vice President positions was not probative of discrimination because plaintiff did not provide information about the number of women who applied for those positions); see also Howard v. BP Oil Co., Inc., 32 F.3d 520, 524 (11th Cir. 1994) (evidence that defendant had no black dealers in the north Atlanta area was not relevant because the plaintiff did not provide any evidence about how many black candidates applied, or how their applications fared compared to those of similarly-qualified white applicants).

Johnson also makes reference to a portion of Richardson's deposition testimony where she talked about incidents where she herself had been a victim of discrimination. Richardson believed that she had been treated unfairly by white managers at a previous job, and she also discussed an incident where she was racially profiled by a white police officer. (Doc. 50, Richardson Dep. at 40-43, 45-47). Like the evidence that Richardson was nicer to black females, this evidence has little probative value. Just because a

person is a victim of discrimination does not mean that the person is more likely to discriminate against others. This evidence carries very little weight in the pretext analysis.

Johnson also states that a "legion" of his fellow employees told him that Richardson was a racist. (Doc. 58 at 23) (citing Doc. 47, Johnson Dep. at 176-78, 182-83, 233, 405-06, 581-82). He observes that Richardson's "antipathy" to white employees was frequently discussed. (Id.). The problem with this evidence is that it is derived entirely from hearsay statements. Therefore, it cannot be considered for purposes of ruling on the summary judgment motion. See Jones, 683 F.3d at 1293-94.

Finally, Johnson points out that he was only halfway through the 60-day PIP when Richardson decided to remove him from Region 8. The Plan specifically stated, however, that failure to show sustained improvement could result in further disciplinary action. (See Doc. 47, Johnson Dep., Def. Exh. 17 at 2). In her December 2010 evaluation, Richardson explained that Johnson was being removed from Region 8 due to his failure to improve his work performance over the first month of the plan. (See Doc. 50, Richardson Dep., Plf. Exh. 11). This evidence is consistent with Richardson's performance-based explanation for Johnson's removal.

When all of the above evidence is added together, it is not sufficient to permit a jury to find in Johnson's favor.  Johnson's statistical evidence has no probative value, and other employees' opinions about Richardson being racist are not admissible.  In addition, Johnson's removal before the end of his PIP sheds little light on Richardson's motivations.  Thus, the only real evidence of pretext for the jury to consider is Johnson's perception that Richardson was nicer to black females than she was to him, and Richardson's testimony that she herself was a victim of discrimination in the past. It would take quite an inferential leap to infer discrimination from Johnson's socialization habits and her personal history, and no reasonable jury could make that leap in light of Richardson's well-documented concerns about Johnson's performance. Thus, Johnson's discrimination claims cannot survive summary judgment under the McDonnell Douglas framework.

### 3.    Johnson has not outlined a "convincing mosaic" of discrimination that could lead a jury to find in his favor.

The McDonnell Douglas burden-shifting approach is just one framework that a plaintiff may use to prove claims of employment discrimination.  See Smith, 644 F.3d at 1328.  Even if a plaintiff cannot meet the requirements of McDonnell Douglas, the plaintiff can still survive summary judgment by "present[ing] circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent."  Id.  "A

AO 72A
(Rev.8/82)

triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.'" Id. (quoting Silverman v. Bd. of Educ., 637 F.3d 729, 734 (7th Cir. 2011)).

The facts of Smith presented a convincing mosaic. The plaintiff, Mitten, was terminated along with several other white employees for sending a "joke" email that contained racist stereotypes about blacks. Smith, 644 F.3d at 1324. Mitten later learned that black employees who sent similar "joke" emails about whites were not terminated. Id.

The evidence also suggested that the employer, Lockheed, had a motive for treating black and white employees differently. At the time, Lockheed was facing considerable public criticism for failing to prevent a shooting by a white supremacist employee at one of the company's plants. Id. at 1329-31, 1334-35, 1337-38. A reasonable jury could have concluded that Lockheed fired Mitten and his colleagues to send a message that it did not tolerate racism towards its black employees, but that the company was not as concerned about similar misconduct committed by black employees. Id. at 1344-45.

28

Finally, there was evidence that the committee that investigated Mitten's misconduct consulted a discipline "matrix" that explicitly listed the affected employees' race. Id. at 1336. That suggested that race did indeed play a role in the disciplinary decisions. Id. at 1345-46. The Eleventh Circuit held that all of this evidence, taken together, supported a circumstantial inference of discrimination. Id. at 1341-47.

The evidence presented by Johnson is considerably less compelling than the evidence presented in Smith. Johnson has not shown that Richardson treated white and black employees, or male and female employees, differently. The only concrete evidence of unequal treatment is White's statement that she did not have to meet the same deadlines as Johnson, and, as discussed above, that statement is inadmissible hearsay. (See Doc. 47, Johnson Dep. at 577-78).

Johnson also has not identified any evidence like the disciplinary "matrix" in Smith that directly shows that Richardson considered race or sex in making her decision. Instead, Johnson argues that a jury could infer a racist motive from Richardson's tough performance expectations, his impression that she was nicer to black females, his replacement by a black female, and Richardson's belief that she was a victim of discrimination in the past. (See Doc. 58 at 22-23). It would be too much of a stretch for a jury to infer discrimination from that evidence, especially since

29

Johnson has conceded that he often failed to meet deadlines and sent Richardson incomplete reports.  The evidence that Johnson has mustered does not present a very "convincing mosaic."  Because no reasonable jury could find that Johnson was subjected to race discrimination or sex discrimination, I recommend that Defendants' motion for summary judgment be granted with respect to those claims.

**B.    Defendants' motion for summary judgment should be denied with respect to Johnson's retaliation claims.**

### 1.    Johnson has established a prima facie case of retaliation.

In addition to his discrimination claims, Johnson is also raising claims for retaliation under Title VII and 42 U.S.C. § 1981.  Johnson may establish a prima facie case of retaliation under the McDonnell Douglas framework by showing that: (1) he engaged in protected activity; (2) he suffered a materially adverse action; and (3) there was a causal connection between the protected activity and the adverse action.  Weeks v. Harden Mfg. Corp., 291 F.3d 1307, 1311 (11th Cir. 2002).  A materially adverse action is one that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68, 126 S.Ct. 2405, 2415, 165 L.Ed.2d 345 (2006) (quotation omitted).

Johnson has introduced evidence to support all three prongs of his prima facie case.  First, he has shown that he complained of discrimination and retaliation in

AO 72A
(Rev.8/82)

October of 2010.  (Doc. 47, Johnson Dep. at 242-43; Doc. 50, Richardson Dep., Plf. Exh. 4).  Defendants do not dispute that those complaints amounted to protected activity.  (See Doc. 46-2 at 14).  As for the second prong, Johnson's removal from Region 8, and his resulting reduction to part-time status, constituted a materially adverse action because the loss of hours and work responsibilities could well deter a reasonable employee from making a charge of discrimination.

Johnson also has shown that there is a causal connection between his protected activity and the materially adverse action.  A plaintiff may establish causation by showing that the protected activity and the materially adverse action were not "wholly unrelated." Shannon v. BellSouth Telecomms., Inc., 292 F.3d 712, 716 (11th Cir. 2002) (quotation omitted).  One way to do this is to demonstrate that there was close temporal proximity between the two events.  Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2007).  Here, Johnson was removed from his position with Region 8 just a little over two months after his first complaints of discrimination.  (See Doc. 47, Johnson Dep. at 242-43; PSMF ¶ 99).  That temporal proximity is close enough to show causation.  Cf. Farley v. Nationwide Mut. Ins. Co., 197 F.3d 1322, 1337 (11th Cir. 1999) (holding that period of seven weeks constitutes "close temporal proximity");

Thomas, 506 F.3d at 1364 (holding that period of more than three months is too long to establish causation through temporal proximity).

> **2.    A reasonable jury could find that Johnson was removed from Region 8 because of his protected activity.**

Since Johnson has established a prima facie case of retaliation, the burden shifts to Defendants to offer a legitimate, non-retaliatory reason for the challenged employment action.  Schaaf v. Smithkline Beecham Corp., 602 F.3d 1236, 1243 (11th Cir. 2010).  Once again, Defendants have been able to meet their burden by pointing to Richardson's concerns about Johnson's performance.  Accordingly, the burden of production shifts back to Johnson to show that Defendants' proffered reasons are just a pretext for retaliation.  Id. at 1244.

To succeed on his retaliation claim, Johnson must do more than show that his complaints of discrimination were one of the motivating factors behind Richardson's decision.  He must establish that his protected activity was a but-for cause of his removal.  Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. ___, ___, 133 S.Ct. 2517, 2528, 186 L.Ed.2d 503 (2013).  In other words, Johnson must demonstrate that Richardson would have left him in his position despite his performance issues if he had not complained of discrimination.

Although this case presents a close question, I conclude that a reasonable jury could infer but-for causation from the evidence presented here.  It is true that Richardson had concerns about Johnson's performance well before he complained of discrimination, but the timing here is suspicious.  When Johnson told Richardson that he was going to make a complaint of discrimination, she immediately responded that she was going to place him on a PIP.  (See Doc. 47, Johnson Dep. at 242-44, 500-01, 572).  Johnson was officially placed on the PIP just days after he filed a formal complaint, and was removed from his position with Region 8 just weeks later, before he was halfway through with the PIP.  (See Doc. 50, Richardson Dep., Plf. Exh. 4; DSMF ¶ 73; PSMF ¶¶ 44, 47, 99).

Moreover, Richardson essentially admitted that Johnson's complaints factored into her decision-making.  She told Johnson that she could not trust him,[4] and acknowledged in her deposition that Johnson's complaints contributed to the loss of trust.  (See Doc. 47, Johnson Dep. at 349-50; Doc. 50, Richardson Dep. at 337-39; see also Doc. 53, Perraud Dep. at 60).  She stated that Johnson's complaints were "dishonest" and gave her the impression that he was not willing to take responsibility

---

[4]Richardson's statement to Johnson is not hearsay because it is not being introduced to prove the matter asserted—that Richardson did not trust Johnson. Rather, it is being used to show that Richardson acted with a retaliatory motive.

33

for his own shortcomings.  (See Doc. 50, Richardson Dep. at 337-39).  A reasonable jury, viewing the evidence in the light most favorable to Johnson, could find that Richardson removed Johnson from Region 8 because of his protected activity.

This evidence might not compel a jury to return a verdict in Johnson's favor. Indeed, a jury might well conclude that Richardson would have removed Johnson for his performance issues even if he had never complained of discrimination or retaliation. At this stage, however, all Johnson has to do is to show that there is a possibility that the case could come out the other way.  The very close timing between Johnson's protected activity and Richardson's discipline, and Richardson's admission that Johnson's complaints played a role in her decision, might cause a jury to return a verdict for Johnson on his retaliation claims.  Therefore, I recommend that the motion for summary judgment be denied with respect to those claims.

## IV.   Conclusion

For the reasons stated above, I **RECOMMEND** that Defendants' motion for summary judgment (Doc. 46) be **GRANTED IN PART** and **DENIED IN PART**. Johnson has not submitted enough circumstantial evidence to support a jury finding that he was removed from his position due to his race or his sex.  Therefore, Defendants are entitled to summary judgment on his discrimination claims.  On the other hand, a

34

reasonable jury could find that Richardson removed Johnson because of his complaints of discrimination.  Thus, I recommend that summary judgment be denied on Johnson's retaliation claims.

IT IS SO RECOMMENDED this 8th day of September, 2014.

_____
GERRILYN G. BRILL
UNITED STATES MAGISTRATE JUDGE

35